**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**CORPUS CHRISTI DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **CRIMINAL ACTION NO. C-09-860** |
| | § | |
| **SANTOS WUILIAN FUENTES,** | § | |
| | § | |
| **Defendant.** | § | |

## OPINION AND ORDER

Before the Court is Defendant Santos Wuilian Fuentes' ("Defendant") Motion to Suppress Evidence (Dkt. No. 25), to which the United States of America ("the Government") has responded (Dkt. No. 30). Following an evidentiary hearing on Defendant's motion, Defendant and the Government filed supplemental briefing (Dkt. Nos. 35 & 36, respectively). After considering the motion, response, supplemental briefing, testimony, and applicable law, the Court is of the opinion that Defendant's motion should be DENIED.

**II. Factual and Procedural Background[1]**

On September 15, 2009, Freer Police Officer Luis Ozuna ("Ozuna") was conducting a traffic stop on southbound South Norton Avenue in Freer, Texas, when he observed a grey Toyota pickup truck traveling northbound at a speed he believed to be in excess of the posted speed limit of 30mph. Ozuna abandoned the initial stop in order to pursue the Toyota, which he eventually caught. Freer Police Officer Noe Saenz ("Saenz"), who was assisting Ozuna with the initial stop, also observed the Toyota and followed Ozuna. Ozuna then conducted a traffic stop on the truck, and Defendant was identified as the driver by his Texas driver's license.

---

[1]. The facts as set forth in this Order are based on the testimony given at the January 19, 2010 evidentiary hearing. (*See* Transcript, Dkt. No. 37.)

1

Because neither Ozuna nor Saenz had confirmed Defendant's speed using radar, they called Freer Chief of Police Roy Salazar ("Salazar") to verify what statute was applicable under the circumstances. After confirming that the proper action would be to give Defendant a warning for "unsafe speed," Ozuna returned to Defendant's truck. Ozuna quickly became suspicious when he noticed four passengers in the back seat of the truck, as the maximum capacity under Texas law is three backseat passengers. The passengers were seated on the floor board with the seat pushed forward and were not wearing seat belts, also in violation of Texas law. At this point, Ozuna and Saenz asked Defendant to step out of the car and began to question Defendant about his itinerary. Ozuna observed that Defendant appeared nervous as he responded that he was coming from Hebbronville after picking up some workers.

Saenz remained with Defendant while Ozuna returned to the truck. At this time Ozuna noticed a fifth backseat passenger lying across the laps of the other four men. The frontseat passenger was identified by a Texas identification card, but the five backseat passengers had no identifying documents of any kind. The passengers told Ozuna that they were concrete workers traveling from Hebbronville to Houston, but they were not wearing work clothes, nor were they traveling with any luggage. Based on the backseat passengers' lack of identification, combined with the manner in which they were seated and their lack of work clothes, Ozuna suspected that the backseat passengers were illegal aliens.

Based on his suspicion that Defendant was engaged in alien smuggling, Ozuna told Saenz to detain Defendant and called for assistance from United States Border Patrol. Border Patrol Agent Carlos Perez performed an immigration inspection on all of the occupants and determined the five backseat passengers were citizens of El Salvador and illegally present in the United States. All seven individuals were arrested, and after being advised of his Miranda rights, Defendant admitted to knowingly transporting the five illegal aliens.

Defendant was indicted on two counts of unlawfully transporting aliens in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) & 1324(a)(1)(B)(ii). In his presently pending Motion to Suppress, Defendant contends that: (1) the initial stop of his vehicle was unlawful because it was made without a warrant and Ozuna and "did not know [D]efendant's traveling speed" (Dkt. No. 25 at 3), and (2) his detention exceeded the permissible limits of intrusion. Thus, Defendant moves to suppress the fruits of this stop, including: (1) any evidence acquired as a result of the stop, namely, the existence of the five illegal aliens in Defendant's truck, and (2) any statements made by Defendant.

## III. Discussion

The Fifth Circuit, following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as *Terry* stops. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984); *United States v. Dortch,* 199 F.3d 193, 198 (5th Cir. 1999). Pursuant to *Terry v. Ohio*, the legality of police investigatory stops is tested in two parts. 392 U.S. 1, 19—20 (1968). Courts first examine whether the officer's action was justified at its inception and then inquire whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *See id.* Here, Defendant argues that the stop was not justified at its inception, and that Ozuna's subsequent action of asking the passengers for identification and inquiring about their itinerary was unrelated to the purpose of the stop, which was to determine whether Defendant was speeding.

### A.  Was the Stop Justified at its Inception?

Defendant contends Ozuna had no basis for stopping him for driving at an unsafe speed because Ozuna "did not know [D]efendant's traveling speed and he had neither a particularized nor objective basis for suspecting any violation of the traffic laws by [D]efendant." (Dkt. No. 25 at 3.) According to Defendant, the Government presented no evidence that Ozuna had the training or

expertise to visually estimate how fast Defendant was driving, and he did not confirm his suspicions by using radar or pacing Defendant's car with his patrol car. As a result, neither Ozuna nor Saenz knew what to call the alleged violation at the time Ozuna stopped Defendant, but instead determined this matter after the stop, and not before. Finally, Defendant was cited for violating Texas Transportation Code section 545.351, which prohibits driving at a speed "greater than is reasonable and prudent under the circumstances then existing."[2] However, Ozuna was unable on cross-examination to state the elements of the offense of "unsafe speed," and the Government failed to offer any evidence that conditions such as the weather, traffic, pedestrians, or other potential hazards existed on the roadway that made Defendant's speed unreasonable or imprudent. Thus, Defendant claims, the stop was not justified at its inception and was therefore unlawful under *Terry*.

As the Government points out, however, a speed in excess of the posted speed limit is prima facie evidence that the speed is not reasonable and prudent and that the speed is unlawful. TEX. TRANSP. CODE §§ 545.352—545.356. Moreover, the issue is not whether Defendant had actually violated the statute prohibiting unsafe speed, but whether it was reasonable for Officers Ozuna and Saenz to believe he had.

Numerous Texas courts have held that an officer's visual observation that a defendant was speeding will rise to the level of reasonable suspicion necessary to validate a traffic stop. *See, e.g.*,

---

2 The statute provides in full:

    (a) An operator may not drive at a speed greater than is reasonable and prudent under the circumstances then existing.

    (b) An operator:

        (1)  may not drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard for actual and potential hazards then existing; and

        (2)  shall control the speed of the vehicle as necessary to avoid colliding with another person or vehicle that is on or entering the highway in compliance with law and the duty of each person to use due care.

    (c) An operator shall, consistent with Subsections (a) and (b), drive at an appropriate reduced speed if:

        (1)  the operator is approaching and crossing an intersection or railroad grade crossing;

        (2)  the operator is approaching and going around a curve;

        (3)  the operator is approaching a hill crest;

        (4)  the operator is traveling on a narrow or winding roadway; and

        (5)  a special hazard exists with regard to traffic, including pedestrians, or weather or highway conditions.

V.T.C.A., Transportation Code § 545.351

*Icke v. State*, 36 S.W.3d 913, 916 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (officer's observation that defendant was speeding alone or with radar confirmation of defendant's speed will rise to level of reasonable suspicion); *Ochoa v. State*, 994 S.W.2d 283, 285 (Tex. App.—El Paso 1999, no pet.) (defendant not harmed by erroneous admission of evidence regarding radar because officer testified without objection that he observed defendant driving at "high rate of speed"); *Mathis v. State*, 2008 WL 2050812, *4 (Tex. App.—Texarkana May 15, 2008, no pet.) (where officer responding to domestic disturbance saw defendant's car drive by and later testified that car "appeared to be traveling above the speed limit," court concluded "[e]ven though there is no evidence [defendant's] speed was measured with radar, [officer] had reasonable suspicion that [defendant's] speed was not reasonable and prudent"); *Talamantez v. State*, 2006 WL 397865, *2 (Tex. App.—San Antonio Feb. 22, 2006, no pet.) ("Due to the deputy's visual observation that the vehicle was driving 'very fast' combined with [his] ten years experience as an officer . . . the record supports a conclusion that reasonable suspicion existed to determine [defendant] was violating a traffic law.").

Both Ozuna and Saenz testified that they observed Defendant driving at a speed in excess of the legal limit. In addition to their visual observations, Ozuna and Saenz also used their sense of sound in making this determination. Ozuna testified, "While I was conducting the traffic stop (of the first vehicle), I heard a loud—the tires on the road, and I observed the vehicle traveling northbound . . . above the posted speed limit of 30 miles per hour." (Tr. 6:8-11.) Likewise, Saenz testified, "[T]he first thing was I heard the . . . acceleration of speed. And, of course, the noise of an engine of a vehicle coming—picking up speed, put it that way." (Tr. 51:20—24.) The officers' testimony was corroborated by the videotape of Ozuna's patrol car dash camera, in which Defendant's truck was audibly louder and appeared to be traveling faster than other passing cars. (Gov. Ex. 1.)

The Court finds both officers to be credible and concludes they have the experience to make a visual and auditory determination that the Defendant was speeding. The Court therefore concludes that the stop was justified at its inception.

### B. Were the Officers' Subsequent Actions Reasonably Related in Scope to the Circumstances that Justified the Stop or to Dispelling Any Reasonable Suspicion Developed During the Stop?

Under the second prong of the *Terry* test, the Court must determine whether the actions of Officers Ozuna and Saenz after they legitimately stopped Defendant's truck were reasonably related to the circumstances that justified the stop, or to dispelling any reasonable suspicion developed during the stop. *Terry*, 392 U.S. at 20. This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges. *United States v. Machuca-Barrera*, 261 F.3d 425, 434 (5th Cir. 2001); *United States v. Dortch*, 199 F.3d 193, 200 (5th Cir. 1999).

Defendant argues that once he was seized, the officers did nothing to confirm or dispel any suspicion that he was driving in excess of the speed limit, but instead "launched into a barrage of questions not at all related to the purpose of the stop." (Dkt. No. 25 at 4.) Then, instead of writing Defendant a citation for speeding and letting him go, the officers continued to unlawfully detain Defendant and the other passengers until agents with Border Patrol arrived.

Ozuna testified that after stopping Defendant's truck, he became suspicious that the backseat passengers may be illegal aliens based on their excessive number as well as the unusual manner in which they were seated. Based on this suspicion, Ozuna questioned Defendant about his itinerary and observed that Defendant appeared nervous as he stated he was coming from Hebbronville after picking up some workers. When the five backseat passengers had no identifying documentation whatsoever, Ozuna formed further reasonable suspicion that they were illegal aliens and that Defendant was knowingly transporting them in violation of United States law. In order to

dispel or confirm this suspicion, Ozuna contacted Border Patrol, which confirmed the passengers' illegal status within 15 minutes of his call.

Under existing Fifth Circuit precedent, Officer Ozuna was acting within the scope of his investigatory duties when he requested identification from Defendant and the other passengers and questioned them about their travel itinerary. *See United States v. Brigham*, 382 F.3d 500, 509—10 (5th Cir. 2004) (en banc). The Court is of the opinion that the totality of the circumstances—the excessive number of passengers in the back seat of the truck, combined with their lack of identification and the fact that Defendant nervously admitted they were "workers"—gave Ozuna reasonable suspicion to believe that the five backseat passengers were illegal aliens, and that Ozuna was aware of that fact. Moreover, Defendant's temporary detention, during which Ozuna contacted Border Patrol and confirmed the passengers were illegal aliens, lasted only 15 minutes and was not excessive.

## IV. Conclusion

For the aforementioned reasons, the Court finds that: (1) the initial stop of Defendant's vehicle was legal, and (2) Defendants' detention was within the permissible limits of intrusion. Defendant's Motion to Suppress Evidence (Dkt. No. 25) is therefore DENIED.

It is so ORDERED.

SIGNED this 23rd day of February, 2010.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE